# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

---

GEORGE COX, JR.,

                    Plaintiff,

v.

COMMISSIONER OF SOCIAL
SECURITY,

                    Defendant.

1:17-cv-08658-NLH

**OPINION**

---

**APPEARANCES:**

LAUREN S. TOVINSKY
JACOBS SCHWABLE & PETRUZELLI PC
10 MELROSE AVENUE - SUITE 340
CHERRY HILL, NJ 08003

    *On behalf of Plaintiff*

STEPHEN M. BALL
SOCIAL SECURITY ADMINISTRATION
OFFICE OF THE GENERAL COUNSEL
300 SPRING GARDEN STREET - SIXTH FLOOR
PHILADELPHIA, PA 19123

    *On behalf of Defendant*

**<u>HILLMAN</u>, District Judge**

    This matter comes before the Court pursuant to Section
205(g) of the Social Security Act, as amended, 42 U.S.C. §
405(g), regarding Plaintiff's application for Disability

Insurance Benefits ("DIB")[1] and Supplemental Security Income

("SSI")[2] under Title II and Title XVI of the Social Security

Act.  42 U.S.C. § 401, et seq.  The issue before the Court is

whether the Administrative Law Judge ("ALJ") erred in finding

that there was "substantial evidence" that Plaintiff was not

disabled at any time between January 8, 2010 through June 30,

2010 for DIB, and between September 14, 2012 through October

13, 2013 for SSI.  For the reasons stated below, this Court

will affirm that decision.

## I.    BACKGROUND AND PROCEDURAL HISTORY

Plaintiff, George Cox, Jr., protectively filed for DIB

and SSI on September 14, 2012.[3]  Plaintiff claims that he is

entitled to these benefits due to the following impairments:

---

[1] DIB is a program under the Social Security Act to provide
disability benefits when a claimant with a sufficient number
of quarters of insured employment has suffered such a mental
or physical impairment that the claimant cannot perform
substantial gainful employment for at least twelve months.  42
U.S.C. § 423 et seq.

[2] Supplemental Security Income is a program under the Social
Security Act that provides supplemental security income to
individuals who have attained age 65, or are blind or
disabled.  42 U.S.C. § 1381 et seq.

[3] A protective filing date marks the time when a disability
applicant made a written statement of his or her intent to
file for benefits.  That date may be earlier than the date of
the formal application and may provide additional benefits to
the claimant.  See SSA Handbook 1507; SSR 72-8.

status-post multiple fall injuries (including distal radius fracture of his right wrist), radial neuropathy of the left wrist, osteoarthrosis of the dorsal spine, cervical radiculopathy, and depressive disorder.

Plaintiff had previously filed for DIB and SSI on February 8, 2007, claiming a disability onset date of June 6, 2005. On January 7, 2010, the Commissioner issued a final decision denying those prior claims.

Because of that prior adjudicated period, Plaintiff's earliest possible onset date for DIB in this case is January 8, 2010.[4] To be entitled to DIB, therefore, he had to show he was disabled on or after January 8, 2010, and on or before June 30, 2010, which is the date Plaintiff was last insured for DIB.[5] For SSI, because Plaintiff returned to work on October 13, 2013,[6] Plaintiff must demonstrate that he was

---

[4] Plaintiff was 42 years old as of January 8, 2010, which classified him as a "younger person." 20 C.F.R. § 404.1563 ("If you are a younger person (under age 50), we generally do not consider that your age will seriously affect your ability to adjust to other work.").

[5] To establish a period of disability for DIB, a claimant must have disability insured status in the quarter in which he became disabled or in a later quarter in which he is disabled. 20 C.F.R. §§ 404.131.

[6] When Plaintiff filed the instant complaint against the Commissioner of Social Security, he claimed to be "totally

disabled on or after September 14, 2012, and on or before

October 13, 2013.[7]

Even though Plaintiff's claims for DIB and SSI presented

two separate periods of disability, the ALJ considered whether

Plaintiff was totally disabled between January 8, 2010 and

October 13, 2013.  On August 2, 2016, the ALJ determined that

Plaintiff was not totally disabled during this period.  The

_____

disabled and [un]able to perform any work which is available
to him within the national economy."  In conjunction with his
complaint, Plaintiff also filed an application to proceed
without prepayment of fees ("IFP application") based on
indigency.  However, his affidavit in support of his IFP
application revealed Plaintiff was employed.  Because
Plaintiff's claim in his complaint that he was currently
totally disabled and not able to perform any work was
inconsistent with his attestation that he is currently
employed, the Court issued an Order directing Plaintiff to
file any amended pleading to ensure that Plaintiff complied
with Federal Rule of Civil Procedure 11.  (Docket No. 2.)
Plaintiff ultimately withdrew his IFP, paid the filing fee,
and after a second Order to Show Cause (Docket No. 11) filed
an amended complaint (Docket No. 12), which addressed the
Court's concern, with Plaintiff clarifying that he is
appealing the denial of benefits for a closed period of
disability spanning from January 8, 2010 until he began
substantial gainful activity on October 13, 2013.

[7] The relevant period for Plaintiff's SSI claim begins with his
September 14, 2012 application date, through the date
Plaintiff returned to work on October 13, 2013.  See 20 C.F.R.
§ 416.202 (claimant is not eligible for SSI until, among other
factors, the date on which he files an application for SSI
benefits); 20 C.F.R. § 416.501 (claimant may not be paid for
SSI for any time period that predates the first month he
satisfies the eligibility requirements, which cannot predate
the date on which an application was filed).

Appeals Council affirmed that decision on September 11, 2017, thus rendering the ALJ's decision final. Plaintiff brings this civil action for review of the Commissioner's decision.

## II. DISCUSSION

### A. Standard of Review

Under 42 U.S.C. § 405(g), Congress provided for judicial review of the Commissioner's decision to deny a complainant's application for social security benefits. Ventura v. Shalala, 55 F.3d 900, 901 (3d Cir. 1995). A reviewing court must uphold the Commissioner's factual decisions where they are supported by "substantial evidence." 42 U.S.C. §§ 405(g), 1383(c)(3); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001); Sykes v. Apfel, 228 F.3d 259, 262 (3d Cir. 2000); Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992). Substantial evidence means more than "a mere scintilla." Richardson v. Perales, 402 U.S. 389, 401 (1971)(quoting Consolidated Edison Co. V. NLRB, 305 U.S. 197, 229 (1938)). It means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Id. The inquiry is not whether the reviewing court would have made the same determination, but whether the Commissioner's conclusion was reasonable. See Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir.

5

1988).

A reviewing court has a duty to review the evidence in its totality.  See Daring v. Heckler, 727 F.2d 64, 70 (3d Cir. 1984).  "[A] court must 'take into account whatever in the record fairly detracts from its weight.'" Schonewolf v. Callahan, 972 F. Supp. 277, 284 (D.N.J. 1997) (quoting Willbanks v. Secretary of Health & Human Servs., 847 F.2d 301, 303 (6th Cir. 1988) (quoting Universal Camera Corp. V. NLRB, 340 U.S. 474, 488 (1951)).

The Commissioner "must adequately explain in the record his reasons for rejecting or discrediting competent evidence." Ogden v. Bowen, 677 F. Supp. 273, 278 (M.D. Pa. 1987) (citing Brewster v. Heckler, 786 F.2d 581 (3d Cir. 1986)).  The Third Circuit has held that an "ALJ must review all pertinent medical evidence and explain his conciliations and rejections." Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 122 (3d Cir. 2000).  Similarly, an ALJ must also consider and weigh all of the non-medical evidence before him.  Id. (citing Van Horn v. Schweiker, 717 F.2d 871, 873 (3d Cir. 1983)); Cotter v. Harris, 642 F.2d 700, 707 (3d Cir. 1981).

The Third Circuit has held that access to the Commissioner's reasoning is indeed essential to a meaningful

court review:

> Unless the [Commissioner] has analyzed all
> evidence and has sufficiently explained
> the weight he has given to obviously
> probative exhibits, to say that his
> decision is supported by substantial
> evidence approaches an abdication of the
> court's duty to scrutinize the record as a
> whole to determine whether the conclusions
> reached are rational.

Gober v. Matthews, 574 F.2d 772, 776 (3d Cir. 1978).

Although an ALJ, as the fact finder, must consider and
evaluate the medical evidence presented, Fargnoli, 247 F.3d at
42, "[t]here is no requirement that the ALJ discuss in its
opinion every tidbit of evidence included in the record," Hur
v. Barnhart, 94 F. App'x 130, 133 (3d Cir. 2004).  In terms of
judicial review, a district court is not "empowered to weigh
the evidence or substitute its conclusions for those of the
fact-finder."  Williams, 970 F.2d at 1182.  However, apart
from the substantial evidence inquiry, a reviewing court is
entitled to satisfy itself that the Commissioner arrived at
his decision by application of the proper legal standards.
Sykes, 228 F.3d at 262; Friedberg v. Schweiker, 721 F.2d 445,
447 (3d Cir. 1983); Curtin v. Harris, 508 F. Supp. 791, 793
(D.N.J. 1981).

**B.    Standard for DIB and SSI**[8]

The Social Security Act defines "disability" for purposes
of an entitlement to a period of disability and disability
insurance benefits as the inability to engage in any
substantial gainful activity by reason of any medically
determinable physical or mental impairment which can be
expected to result in death, or which has lasted or can be
expected to last for a continuous period of not less than 12
months.  <u>See</u> 42 U.S.C. § 1382c(a)(3)(A).

Under this definition, a Plaintiff qualifies as disabled
only if his physical or mental impairments are of such
severity that he is not only unable to perform his past
relevant work, but cannot, given his age, education, and work
experience, engage in any other type of substantial gainful
work which exists in the national economy, regardless of

---

[8] The standard for determining whether a claimant is disabled
is the same for both DIB and SSI.  <u>See</u> <u>Rutherford v. Barnhart</u>,
399 F.3d 546, 551 n.1 (3d Cir. 2005) (citation omitted).
DIB regulations are found at 20 C.F.R. §§ 404.1500-404.1599.
Parallel SSI regulations are found at 20 C.F.R. §§ 416.900-
416.999, which correspond to the last two digits of the DIB
cites (e.g., 20 C.F.R. § 404.1545 corresponds with 20 C.F.R. §
416.945).  The Court will provide citations only to the DIB
regulations.  <u>See</u> <u>Carmon v. Barnhart</u>, 81 F. App'x 410, 411 n.1
(3d Cir. 2003) (because the law and regulations governing the
determination of disability are the same for both DIB and SSI
the Court provided citations to only one set of regulations).

whether such work exists in the immediate area in which he
lives, or whether a specific job vacancy exists for him, or
whether he would be hired if he applied for work.  42 U.S.C. §
1382c(a)(3)(B) (emphasis added).

The Commissioner has promulgated regulations[9] for
determining disability that require application of a five-step
sequential analysis.  See 20 C.F.R. § 404.1520.  This five-
step process is summarized as follows:

1.  If the claimant currently is engaged in substantial
    gainful employment, he will be found "not disabled."

2.  If the claimant does not suffer from a "severe
    impairment," he will be found "not disabled."

3.  If the severe impairment meets or equals a listed
    impairment in 20 C.F.R. Part 404, Subpart P,
    Appendix 1 and has lasted or is expected to last for
    a continuous period of at least twelve months, the
    claimant will be found "disabled."

4.  If the claimant can still perform work he has done
    in the past ("past relevant work") despite the
    severe impairment, he will be found "not disabled."

5.  Finally, the Commissioner will consider the
    claimant's ability to perform work ("residual
    functional capacity"), age, education, and past work
    experience to determine whether or not he is capable
    of performing other work which exists in the
    national economy.  If he is incapable, he will be
    found "disabled."  If he is capable, he will be

---

[9] The regulations were amended for various provisions effective
March 27, 2017.  See 82 F.R. 5844.  Because the ALJ issued her
decision prior to that effective date, the Court must employ
the standards in effect at the time of his decision.

found "not disabled."

20 C.F.R. § 404.1520(b)-(f).

Entitlement to benefits is therefore dependent upon a finding that the claimant is incapable of performing work in the national economy.

This five-step process involves a shifting burden of proof.  See Wallace v. Secretary of Health & Human Servs., 722 F.2d 1150, 1153 (3d Cir. 1983).  In the first four steps of the analysis, the burden is on the claimant to prove every element of his claim by a preponderance of the evidence.  See id.  In the final step, the Commissioner bears the burden of proving that work is available for the Plaintiff: "Once a claimant has proved that he is unable to perform his former job, the burden shifts to the Commissioner to prove that there is some other kind of substantial gainful employment he is able to perform."  Kangas v. Bowen, 823 F.2d 775, 777 (3d Cir. 1987); see Olsen v. Schweiker, 703 F.2d 751, 753 (3d Cir. 1983).

**C.    Analysis**

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset of disability through the end of the relevant time period.  At

step two, the ALJ found that Plaintiff's status-post multiple fall injuries (including distal radius fracture of the right wrist), radial neuropathy of the left wrist, osteoarthrosis of the dorsal spine, cervical radiculopathy, and depressive disorder were severe. At step three, the ALJ determined that Plaintiff's severe impairments or his severe impairments in combination with his other impairments did not equal the severity of one of the listed impairments. Plaintiff did not have any past relevant work, but the ALJ then determined that Plaintiff's residual functional capacity ("RFC") rendered him capable of performing unskilled work at the light exertional level (steps four and five).[10]

The ALJ determined Plaintiff's RFC to be as follows:

After careful consideration of the entire record, the undersigned finds during the period of January 8, 2010 through October 13, 2013, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he was able to walk/stand up to 6 hours per day but for no more than 1 hour at a time and then would need to sit/shift positions for 4-5 minutes while remaining on task. He was not able to climb ladders/ropes/scaffolds. He could not work

_____

[10] See 20 C.F.R. § 404.1568 (explaining that unskilled work "is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time"); 20 C.F.R. § 404.1567 ("Physical exertion requirements. To determine the physical exertion requirements of work in the national economy, we classify jobs as sedentary, light, medium, heavy, and very heavy.").

around heights or operate dangerous machinery (defined as
machines that cut or shear). He could occasionally climb
ramps/stairs and occasionally stoop. He could perform no
more than frequent handling with the non-dominant right
hand. He was able to understand, remember and carry out
routine instructions consistent with unskilled work. He
was limited to low-stress work (defined as routine work
having no fast production-rate pace, such as an assembly
line). He would be off-task 5% of an 8-hour workday, in
addition to normal breaks.

(R. at 14-15.)

Based on that RFC and the hypotheticals posed by the ALJ

to the Vocational Expert ("VE") at the hearing, the VE

testified that someone with Plaintiff's RFC would be capable

of performing jobs such as an information clerk, mail clerk,

and office helper.[11]  (R. at 19.)

Plaintiff argues that the ALJ erred in her RFC assessment

in two ways.  Plaintiff contends that the ALJ found the

impairment to Plaintiff's left wrist to be "severe" at Step

Two, but the ALJ did not accommodate that severe impairment in

the RFC assessment.  Plaintiff also contends that the ALJ

erred in not finding his mental impairments, other than his

depression, to be severe at Step Two, and then failed to

---

[11] The ALJ also questioned the VE if jobs existed with
Plaintiff's RFC but at the lowest exertional level – sedentary
– and the VE testified that such jobs would be call-out
operator, surveillance system monitor, and charge account
clerk.  (R. at 19.)

consider all of his mental impairments, independently or in combination with his physical impairments, in the RFC assessment.

The ALJ was tasked with determining whether, from January 18, 2010 through October 13, 2013, Plaintiff suffered from medically determinable physical or mental impairments that lasted, or were expected to last, for a continuous period of least twelve months.  20 C.F.R. §§ 404.1509, 416.909.  Once the ALJ made that finding, the ALJ was required to determine if those impairments precluded Plaintiff from engaging in any substantial gainful work which exists in the national economy, thus rendering Plaintiff disabled during this closed period. 42 U.S.C. § 423(d)(2)(A).  The Court finds that substantial evidence supports the ALJ's conclusion that Plaintiff did not suffer from medically determinable impairments that lasted at least 12 months between January 18, 2010 and October 13, 2013 which precluded his ability to work during that time.

In June 2005, Plaintiff fell off a roof, and he fractured his right wrist and sustained nerve damage to his left side. Following that accident, Plaintiff claims that he suffered from pain in his wrists, low back, shoulder and legs, with good days and bad days.  Plaintiff also claims that the

accident and resulting injuries and pain caused him to become depressed, along with difficulty focusing, intermittent auditory hallucinations, and suicide attempts. Plaintiff states that he self-medicated with drugs and alcohol during that time until October 2013, when he overcame his polysubstance abuse.

As detailed by the ALJ in her decision and evidenced by the record, Plaintiff's primary treating source for his physical and mental impairments was the emergency department ("ED") at two hospitals. With regard to his physical impairments, from July 2011 through May 2013, Plaintiff self-reported to the ED eight times complaining mainly of back pain. While the examinations found some minimal tenderness, the diagnostic testing and physical examinations revealed normal findings for Plaintiff's overall physical condition and noted no limitations on his use of his upper extremities.

On October 6, 2012, it was noted in the ED treatment notes that for the previous six months, Plaintiff had filled a monthly prescription for 50 oxycodone and 50 Xanax, and that Plaintiff had just filled the prescription five days before that ED visit for his "recurrent back pain." The treatment notes also related that since September 2011, Plaintiff

obtained 29 prescriptions from six providers filled at 10
pharmacies by using three different addresses.  Plaintiff was
informed that the ED would not be able to continue to
supplement his prescriptions.

For Plaintiff's mental impairments, on December 3, 2011,
Plaintiff self-reported to the ED complaining of a suicide
attempt the night before when he tried to hang himself.  An
examination of his neck appeared normal, and a drug screen
test was positive for benzodiazepines and opiates.  He was
diagnosed with major depressive disorder and discharged.  The
next day he returned to the ED complaining of back pain, and
his psychological examination was normal.

On February 28, 2012, Plaintiff walked into the ED
complaining of anxiety, depression, decreased concentration
and ability to sleep, but his psychological examination was
normal.  Plaintiff was diagnosed with anxiety, given Percocet
and Xanax, and discharged.  The exact same scenario occurred
on March 17, 2012.

On March 21, 2013, Plaintiff voluntarily admitted himself
to an in-patient treatment center.  Two weeks before,
Plaintiff had been admitted to a different facility for
cutting his right wrist with a box cutter.  Plaintiff reported

that the night of the incident on March 4, 2013, he binged on

alcohol.  When he entered the in-patient treatment center on

March 21, 2013, Plaintiff tested positive for benzodiazepines

and opiates.  Plaintiff was discharged on April 23, 2013, with

the diagnosis of Bipolar Disorder, Personality Disorder, low

back pain, poor coping skills, relationship problems, drug use

problems, and a GAF at discharge of 50.[12]  Plaintiff was

instructed to maintain his medications, which no longer

included Percocet, obtain out-patient therapy, and attend

Alcoholics Anonymous and Narcotic Anonymous meetings.

On May 6, 2013, Plaintiff voluntarily admitted himself to

---

[12] The GAF Scale ranges from zero to one-hundred.  An
individual's "GAF rating is within a particular decile if
either the symptom severity or the level of functioning falls
within the range." "[I]n situations where the individual's
symptom severity and level of functioning are discordant, the
final GAF rating always reflects the worse of the two." "In
most instances, ratings on the GAF Scale should be for the
current period (i.e., the level of functioning at the time of
the evaluation) because ratings of current functioning will
generally reflect the need for treatment or care."  Gulin v.
Commissioner, 2014 WL 1466488, 4 n.2 (D.N.J. 2014) (citing
American Psychiatric Association, Diagnostic and Statistical
Manual of Mental Disorders 34 (4th ed. text rev. 2000) ("DSM-
IV-TR")).  A GAF rating of forty-one to fifty indicates that
an individual has symptoms deemed Serious (e.g. suicidal
ideation, severe obsessional rituals, frequent shoplifting),
or any serious impairment in social, occupational, or school
functioning (e.g., no friends, unable to keep a job).  DSM-IV-
TR 34.

a different in-patient center, where he stayed for a week.

Plaintiff complained of suicidal ideation, and tested positive

for marijuana and PCP.[13]  Plaintiff reported that he had failed

to comply with his medication and follow-up care regimen from

March.  Once his medications were restarted, he reported

improved mood and was amenable to outpatient care.  His mental

status examination at discharge related:

> Yesterday when I met with the patient he was awake,
> alert, and oriented x3.  He was cooperative to interview.
> He reported his mood was "all right."  Affect was full in
> range and appropriate.  Thought process was logical and
> future oriented.  Content was related to questioning.  No
> delusions or symptoms of psychosis were noted.  He was
> denying suicidal or homicidal ideation.  Insight and
> judgment appeared fair.  Memory and concentration were
> intact.

(R. at 514.)  Plaintiff's diagnosis at discharge was "mood

disorder, rule out bipolar disorder, marijuana abuse, rule out

PCP abuse."

By October 2013, Plaintiff reported that after he was

discharged from the hospital, he regained some clarity and a

sense of purpose.  To his credit, he overcame his

polysubstance abuse and started a part-time job as a warehouse

worker that evolved into full-time employment.

---

[13] Plaintiff denied he intentionally used PCP and believed that
the marijuana was laced with PCP.

Plaintiff challenges the ALJ's assessment that during the period of January 2010 and October 2013, he retained the ability to perform light, unskilled work. For his physical impairments, Plaintiff points out that the ALJ specifically included a restriction for his right hand, but not for the injury to his left wrist, which the ALJ had found to be a severe condition. Plaintiff argues this incongruity shows that the RFC assessment was flawed.

The Court does not agree. The RFC assessment takes into consideration all of a claimant's impairments in combination, including those that the ALJ has found to be severe, as well as those that are not deemed to be severe at Step Two. See 20 C.F.R. § 404.1545(a)(2) ("We will consider all of your medically determinable impairments of which we are aware, including your medically determinable impairments that are not 'severe,' as explained in §§ 404.1520(c), 404.1521, and 404.1523, when we assess your residual functional capacity."). While assessing those severe and non-severe impairments in combination when formulating the RFC, the ALJ is not required to specify each impairment's impact on the overall RFC determination. Although RFC assessments, like the one here, often contain some specific limitations, the determination of

an exertional level and skill level that a claimant can
perform encompasses all impairments in order to reflect what
the claimant can still do despite his limitations.  20 C.F.R.
§ 416.945(a); Garrett v. Commissioner of Social Sec., 274 F.
App'x 159, 163 (3d Cir. 2008) (citing 20 C.F.R. § 404.1520(e),
(f)) ("At step four, the Commissioner determines whether,
despite her severe impairments, the claimant retains the RFC
to perform her past relevant work.").

     In this case, the ALJ determined that Plaintiff was
capable of unskilled work at the light exertional level.  That
meant Plaintiff was able to lift no more than 20 pounds at a
time with frequent lifting or carrying of objects weighing up
to 10 pounds.  20 C.F.R. § 404.1567.  Such a finding is in
contrast to a finding of medium work (lifting more than 50
pounds at a time with frequent lifting or carrying of objects
weighing up to 25 pounds), heavy work (lifting no more than
100 pounds at a time with frequent lifting or carrying of
objects weighing up to 50 pounds), or very heavy work (lifting
objects weighing more than 100 pounds at a time with frequent
lifting or carrying of objects weighing 50 pounds or more).
Id.

     Thus, implicit in the finding that Plaintiff was capable

of light work is the acknowledgment that all his impairments –
including his severe impairment of the left wrist – were
physically limiting to that degree.  Moreover, the ALJ clearly
contemplated how the left wrist condition affected the RFC
determination, specifically noting that Plaintiff's fairly
extensive medical records revealed "few references to left
upper extremity symptoms."  (R. at 18.)

Additionally, it is Plaintiff's burden at Step Four to
demonstrate that he lacked sufficient RFC to perform any work.
Plummer v. Apfel, 186 F.3d 422, 428 (3d Cir. 1999).  The
medical records reviewed by the ALJ, as well as Plaintiff's
testimony, did not show that Plaintiff's left wrist required a
more specific limitation.  With regard to the specific
limitation for Plaintiff's right wrist, the ALJ explained,
"Though he complained of residual right wrist pain from 2005
fall injury, physical examinations revealed normal range of
motion and strength of this extremity, with few references to
left upper extremity symptoms.  Nonetheless, the undersigned
has adopted a handling limitation to accommodate his purported
right wrist pain."  (R. at 18.)

The Court recognizes a superficial inconsistency between
a finding of a severe left wrist condition at Step Two and the

absence of a specific limitation for the left wrist at Steps

Four and Five.  However, the regulations and the decisional

law do not require, as Plaintiff seems to contend, that every

severe condition must have a mirror image limitation when

determining an RFC.  The Plaintiff cites no law for that

proposition and we can find none.  What is required is that

the ALJ consider the relevant medical conditions in the

context of the medical record as a whole.  Here, the ALJ

acknowledged the Plaintiff's left wrist complaint, assessed it

in the context of the overall medical record, and plainly gave

it appropriate weight in arriving at her assessment of a light

exertional RFC.  Where, as here, the ALJ endeavored to address

all of Plaintiff's complaints in the RFC determination, even

ones that were not severe or well-supported, along with the

severe impairments determined at Step Two there is no error.[14]

---

[14] In a related argument, Plaintiff contends that the ALJ erred
in the RFC determination at Step Five by finding Plaintiff
capable of jobs that require frequent bilateral handling,
despite his severe left wrist impairment.  This argument fails
for two reasons.  First, since the ALJ did not err in the RFC
assessment it follows that the jobs based on that RFC are
proper.  Second, Plaintiff argues that the majority of jobs
require bilateral handling, but does not contend that all the
jobs require that function.  Because the ALJ found at least
one job that exists in sufficient numbers in the national
economy that Plaintiff is capable of performing even if he had
more restrictions in bilateral handling, this does not
constitute reversable error.  See Reed v. Commissioner, 2018

Turning to Plaintiff's argument that the ALJ erred in failing to consider Plaintiff's mental impairments in the RFC, the Court finds that the ALJ properly supported her assessment. As detailed above, Plaintiff suffered from depression, which the ALJ found to be severe, along with various other diagnoses, and he presented himself to the emergency department for two incidents of attempted suicide. For the first incident, the ED reported Plaintiff to have a normal psychological evaluation the next day when he returned to the ED for back pain seeking pain medication.

As for the second incident, Plaintiff admitted it was after a night of binge drinking, and upon admission he tested positive for opiates. After in-patient care, the elimination of Percocet, and a psychiatric medication regimen that proved effective, Plaintiff was discharged. A few months later, Plaintiff failed to follow his treatment plan, and he returned

---

WL 5617549, at *6 (D.N.J. Oct. 30, 2018) (citing Nalej v. Berryhill, 2017 WL 6493144, at *11 (D.N.J. 2017) (citing 20 C.F.R. § 416.966(b))(explaining that SSA regulations provide that work exists in the national economy when there is a significant number of jobs in one or more occupations that an individual can perform, and holding that even if the ALJ erred in finding the plaintiff capable of performing two of three jobs, he did not err as to the third job, and that finding as to only one job was sufficient to support his determination that the plaintiff was not disabled)).

to in-patient treatment, testing positive for marijuana and
PCP.  Once he resumed his medications, he was discharged with
a positive outlook.

The ALJ reviewed this evidence, as well as Plaintiff's
testimony, and found that even though Plaintiff had two
episodes of decompensation, Plaintiff otherwise had mild
restrictions in daily living activities, mild difficulties in
social functioning, and moderate difficulties in
concentration, persistence, and pace.  (R. at 13, 14.)  To
accommodate these restrictions, the ALJ limited Plaintiff to
unskilled work in a low-stress environment.  Other than during
the two periods of in-patient treatment in March and May 2013,
the evidence does not refute that Plaintiff was capable of
"work which needs little or no judgment to do simple duties
that can be learned on the job in a short period of time."  20
C.F.R. § 404.1568 (defining "unskilled work").  Indeed, less
than six months later, Plaintiff returned to work as a
warehouse worker, which is work that falls into the unskilled
category.  See Braker v. Commissioner of Social Security, 2017
WL 374476, at *8 (D.N.J. 2017) (explaining that the VE
testified that a warehouse worker (DOT 922.687-058) is
classified as unskilled labor at medium exertional level);

<u>Brando v. Colvin</u>, 2017 WL 2364194, at *11 (D.N.J. 2017)

(same).

    Plaintiff argues that being in in-patient treatment for several weeks during the relevant time period would have precluded him from working at any job during that time.  That is not the relevant test for DIB or SSI, however.  The definition of "disability" under the SSA is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment or combination of impairments that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months."  (R. at 10.)

    Although Plaintiff was unable to work while hospitalized, those episodes of decompensation cumulatively lasted only several weeks, and not for at least 12 months.  As explained above, the ALJ determined that for the remainder of the relevant time period, Plaintiff was capable of light, unskilled work.  Moreover, Plaintiff's in-patient treatment occurred five and seven months before he returned to work, which also refutes the 12-month durational requirement.  <u>See, e.g.</u>, <u>Lee v. Commissioner Social Sec.</u>, 248 F. App'x 458, 461, (3d Cir. 2007) (stating that the claimant's return to work was

24

not dispositive of her eligibility for a closed period of disability, but concluding that the claimant's return to the workforce was appropriately considered by the ALJ in resolving the claimant's application for a closed period of disability from December of 1996 to July of 2002, the month immediately preceding her return to the workforce).  Consequently, the Court finds that the ALJ did not err in her assessment of Plaintiff's mental impairments.

## III. CONCLUSION

This Court may not second guess the ALJ's conclusions, and may only determine whether substantial evidence supports the ALJ's determinations.  <u>Hartzell v. Astrue</u>, 741 F. Supp. 2d 645, 647 (D.N.J. 2010) (citing <u>Williams v. Sullivan</u>, 970 F.2d 1178, 1182 (3d Cir. 1992)) (explaining that the pinnacle legal principal is that a district court is not empowered to weigh the evidence or substitute its conclusions for those of the ALJ).  The Court finds in this case the ALJ's determination that Plaintiff was not totally disabled between January 8, 2010 and October 13, 2013 is supported by substantial evidence.  The decision of the ALJ is therefore affirmed.

An accompanying Order will be issued.

Date: <u>December 10, 2018</u>      <u>s/ Noel L. Hillman</u>
At Camden, New Jersey      NOEL L. HILLMAN, U.S.D.J.